**RAILROAD COMMISSION et al.**

**v.**

**IRWIN.**

**No. 10199.**

Court of Civil Appeals of Texas.

Austin.

Feb. 10, 1954.

Rehearing Denied March 3, 1954.

John Ben Shepperd, Atty. Gen., Dean J. Capp, Asst. Atty. Gen. for Railroad Commission.

Turner, Rodgers, Winn, Scurlock & Terry, Frank J. Scurlock, Dallas, L. A. Thompson, Tulsa, Okl., A. W. Bounds, Houston, of counsel, for Stanolind Oil & Gas Co.

Cyril J. Smith, Houston, Ralph W. Yarborough and E. Wayne Thode, Austin, for appellee.

ARCHER, Chief Justice.

This is a suit filed by appellee March 26, 1953, to restrain the Railroad Commission from ordering appellee's R. R. Reynolds Well No. 3, South Houston Field, Harris County, taken off the proration schedule, as the Commission was threatening to do. Stanolind Oil and Gas Company intervened in the case on March 31, 1953, as a party defendant, and the case involves the legality of an oil well.

A permanent injunction was granted Irwin in the final judgment of July 16, 1953, enjoining enforcement of the Commission's order taking Irwin's well off the allowable schedule and also enjoining enforcement of the Commission's order canceling Irwin's Rule 37 permit. Most of the evidence was stipulated.

The regularity and sufficiency of the proceedings before the Commission are involved, as is compliance with the terms of the permit.

The five-acre tract on which well No. 3 in question is located has two other producing wells, both of which were completed in 1936, and because of the spacing provisions of the field were granted as exceptions to the rule.

Wells Nos. 1 and 2 are only 50 feet apart, but the Commission has determined that there are two reservoirs in the field, and close drilling is permitted where the production is from separate reservoirs. Well No. 1 is producing from the Miocene reservoir and well No. 2 is producing from the Oligocene reservoir.

On October 24, 1951, R. A. Irwin, appellee, filed an application for a third well on Form No. 1, omitting formal parts, as follows:

"Date  Oct. 24, 1951

Name of Company or operator:

| | |
|---|---|
| Name | R. A. Irwin |
| Address | City National Bank Bldg. |
| City | Houston, Texas |

Description of fare or lease:

| | | | |
|---|---|---|---|
| Name of Lease | R. R. Reynolds | | |
| Number of Acres | 5 | Well No. | 3 |
| Number of wells on lease | 2 | | |
| Survey | Mary A. Nichols A–1350 | | |

\*  \*  \*  \*  \*  \*

Date work will start drilling   Immediately

Depth to which you propose to drill   6500

\* \* \*"

The Examiner's Memorandum is as follows:

"Nov. 14, 1951

"Mr. Milton C. O'Neal appeared for applicant and stated:

"This is the application of R. A. Irwin for special permit to drill his R. R. Reynolds No. 3 well in the South Houston Field, Harris County, Texas. The field rules provide for 417 and 835 foot spacing with 16 acre units. This well No. 3 on this 5 acre lease will be the first well to be completed and produced from the horizon in which it will be complete and will never be produced concurrently from the same horizons in which wells Nos. 1 and 2 are producing.

"Well No. 1 on this lease is producing from the Miocene and well No. 2 from the Oligocene sand.

"We would like to read for the record here a paragraph from a letter addressed to us by Mr. E. A. Byman with Mr. Irwin's organization in Houston. 'The Reynolds No. 3 well is to be drilled for the purpose

of testing sands in the Stanolind-Matthews well No. 3 directly west of the Reynolds which is completed in a sand section from the depth of 5,400 feet to a depth of 5,412 feet, and also the Stanolind-Wyendelts No. 1 well which has recently been completed at a depth of 4836 to 4850 feet. Both of these wells have been completed within the last 12 months and represent new producing sands not previously drained. A geological interpretation of the South Houston Field indicates that we may expect to encounter both of these sands as well as other sands which may be productive due to the fact that our Reynolds lease is higher on the structure. We feel, therefore, that this well is of an exploratory nature and will be completed in a sand other than the Miocene and Oligocene sands now being produced from existing wells on this lease.'

"We want permission to drill it to 6500 feet and complete it in some sand and not either of the two sands that are presently producing in wells Nos. 1 and 2. We would call the Examiner's attention to the waiver from the Stanolind Oil & Gas Company which is the only offset operator to this lease and request that the 15 day waiting clause be omitted.

"We respectfully request that this permit be granted as applied for as the first well on the lease to be produced from the horizon or horizons in which it may be completed to allow applicant to further develop his lease, to prevent confiscation of property and to protect correlative rights. There are presently two wells on the lease both of them completed as previously mentioned. There are no outstanding permits; no drilling operations are now in progress on the lease, and authority is requested to dually complete the well in any two productive sands found, neither of which are producing on the two wells now on the lease. All of the lease is considered productive. * * *"

The permit was issued in terms as follows:

"Case No. 42,409  No. 3 R. R. Reynolds, 5 ac., Mary A. Nichols Survey, A–1350, Block 24, J. D. Jones Subd. South Houston Field, Harris County, Texas Applicant: R. A. Irwin City National Bank Bldg., Houston, Texas

Rule 37

"The application of R. A. Irwin for an exception under the provisions of Rule 37 coming on to be heard on the 14th day of November, 1951, by the Railroad Commission of Texas, and it appearing that the petition shows good cause; that no injustice will be done by the granting of such exception, and that same should be granted to prevent confiscation and or to prevent physical waste:

"Now, Therefore, It Is Ordered: That the application of R. A. Irwin for an exception under the provisions of Rule 37 and a permit to drill well No. 3 R. R. Reynolds Lease, containing 5 acres of land out of the Mary A. Nichols Survey, A–1350, Block 24, J. D. Jones Subdivision, South Houston Field, Harris County, Texas, as shown by plat submitted, is hereby approved and applicant is granted permission to drill well No. 3 to be spaced as follows:

"115 feet north of south line; 50 feet southwest of well No. 1

"50 feet southeast of well No. 2 Permission is granted to dually produce said well from any two zones after hearing before Engineering Dept. as to methods of dual completion: Provided said well shall never be produced concurrently from the same zones as wells Nos. 1 and 2 produce from. * * *

"Entered at Austin, Texas, on this the 21 day of November 1951.

"Attest:        "Olin Culberson
                        Chairman
                  Ernest O. Thompson
                        Commissioner
O. D. Hyndman   W. J. Murray, Jr.
Secretary            Commissioner"

The well was drilled to a depth of 5,734 feet, production was not had and the well was plugged back and completed at an interval of 4,366–86 feet. This depth is within the Oligocene reservoir, from which well No. 2 is producing.

On October 10, 1952, appellee wrote the Commission, in part as follows:

"I am the operator of the R. R. Reynolds lease in the South Houston Field of Harris County, Texas. This lease has two wells, the Nos. 2 and 3, that are producing from the Oligocene-Frio formations.

"Will you kindly set a date for a hearing at which time I shall endeavor to show that these two wells are producing from separate reservoirs and that there is no intercommunication between the producing sands of these wells. This hearing is requested to conform with your previous letter of August of this year."

A hearing was had and evidence was offered by appellee's geologist as to the sand condition and zones of production. Other evidence was tendered by Stanolind, an offset operator. The application was denied and appellee notified.

Appellee filed a Motion for Rehearing claiming that the Commission had not properly weighed the facts.

A rehearing was had on January 7, 1953, and the application denied, and appellee was so notified by letter dated March 13, 1953, and by letter dated March 23, 1953 appellee was advised that his well was being taken off the allowable schedule.

The suit was filed March 26, 1953. On May 25, 1953, the Commission signed an order (as nunc pro tunc) canceling the permit for well No. 3 and declaring it illegal, and by amended pleading this order was attacked.

Appellants contend the special permit was issued based on the application of appellee, and fixed conditions were put in the permit under which the well could be produced, and that appellee did not meet the burden of showing that he had not violated the conditions and that the well was illegal and the Commission was authorized to take the well off the allowable schedule. The further claim is made that since appellee represented to the Commission that the well would never be produced concurrently from the same horizons in which the other two wells are producing, and based on this statement the Commission granted the permit with the conditions as set out, and that since the well was not drilled and produced in conformity with the permit that it was the duty of the Commission to shut the well in.

The appellee contends that there has never been a notice and hearing on the question of whether appellee's permit should be canceled, and that the order of May 25, 1953, was made at a time the Commission had been deprived of jurisdiction over the well No. 3 by the terms of the temporary injunction and is void. Appellee further says that there was nothing pending before the Commission at the time of the May 25th order, and is not a "nunc pro tunc" order, because it was not through mistake or inadvertence that it was not entered on March 23, 1953.

Appellee's well No. 3 was drilled, completed and an allowable fixed and placed on the proration schedule by the Commission.

On April 22, 1952, a notice of a hearing was given by the Commission for the purpose of considering the application of R. A. Irwin requesting a change in the field rules covering the production acreage in the South Houston Field, and embodying from Irwin's application a paragraph as follows:

"At this hearing I should like to present evidence which will enable the Commission to re-classify the South Houston Field as a piercment type salt dome and request at that time that Salt Dome rules and regulations be applied to this field. It is my intention to demonstrate that the Oligocene and miocene formations are in fact composed of different sands with diverse fluid and gas levels and that these various sands shall be considered as separate and distinct reservoirs."

On August 4, 1952, the Commission wrote Mr. Irwin as follows:

"Mr. R. A. Irwin
City National Bank Bldg.
Houston 2, Texas
Dear Sir:

In re: Application to reclassify the South Houston Field, Harris County, Texas, as a Piercement Type Salt Dome Field and to amend the rules therefor.

"This is to advise that the Commission, at a formal conference held this date, denied the above set out application. However, the Commission directed that, effective September 1, 1952, the allocation formula be amended to provide that the daily field allowable be distributed on a 50% per well and 50% acreage basis.

"In addition, the Commission ruled that the Miocene and Oligocene (Frio) sections will each continue to be considered as single reservoirs with the provision that exceptions may be granted, after proper notice and hearing, to a well that is completed in a separate reservoir due to sealing faults.

"A formal order amending the present allocation formula will be forthcoming.

"Yours very truly,
s/Arthur H. Barbeck
Arthur H. Barbeck
Chief Engineer"

Appellee wrote the following letter to the Commission:

"Oct. 10, 1952
R. A. Irwin
1106 City National Bank
Houston, Texas.

"Honorable Railroad
Commission of Texas
Oil and Gas Division.
Tribune Building
"Attention: Mr. H. M. Batis and Mr. A. H. Barbeck:

"I am the operator of the R. R. Reynolds lease in the South Houston Field of Harris County, Texas. This lease has two wells, the Nos. 2 and 3, that are producing from the Oligocene-Frio formations.

"Will you kindly set a date for a hearing at which time I shall endeavor to show that these two wells are producing from separate reservoirs and that there is no intercommunication between the producing sands of these wells. This hearing is requested to conform with your previous letter of August of this year.

"I also request that the allowables on the Reynolds lease be left unchanged until the hearing has been held.

"Sincerely,
s/ R. A. Irwin
R. A. Irwin"

A notation is made on this letter:

"Commission at conference on 10/12–52 said not to change allowables pend-hearing.

"AHB."

It is to be noted that appellee stated to the Commission that his wells Nos. 2 and 3 were producing from the Oligocene-Frio formations.

Notice was given of a hearing to consider the application of appellee to show that wells Nos. 2 and 3 are producing from separate reservoirs, and that there is no intercommunication between the producing sands of these two wells.

At this hearing the Examiner made his report to the Commission:

"Austin, Texas
December 3, 1952
"Memorandum To The Commission:
"Application: R. A. Irwin pertaining to his Reynolds Wells Nos. 2 and 3, South Houston Field, Harris County, Texas
"Date of Hearing: November 6, 1952
"Appearances: Cyril J. Smith, Benjamin T. Simmons, R. W. Harrison and R. A. Irwin for the applicant. J. W. Nichols, Hanck H. Steele, R. L. Evans, Tom B. Malloy, C. G. Condra and Guy Buell for Stanolind Oil and Gas Company
"At prior hearings it was shown that the Marg-Frio Zone in the South Houston Field has been treated by all operators and

the Commission as a single reservoir; that Mr. Irwin recently completed his second well, the No. 3 Reynolds, on a 5 acre tract to the Marg-Frio Zone, and has requested that the zone of completion in this second well be designated as a separate zone of production and therefore subject to development on a reservoir basis. This segregating of the Marg-Frio section into separate reservoirs was bitterly contested at the prior hearings, so this hearing was called to give Irwin an opportunity to show that the two zones are separate and distinct. Stanolind contested this application.

"Mr. Irwin's geologist submitted a cross section (Ex. #1) between the No. 2 and No. 3 Reynolds wells showing seven zones of porosity thereon. Zone 'C' in the interval at 4366 to 4386 produces in the No. 3 Well, and Zones 'F' and 'G' in the interval 4530 to 4720 feet produce in the No. 2 well. There is approximately 160 feet of vertical separation between the producing interval of the two wells, and Mr. Simmons testified that the 'E' Sand lying between these intervals was found to be water bearing in the No. 3 well. This is an indication of separateness of the reservoirs above and below the 'E' Sand.

"As further indication of separateness pressure data on the Reynolds Wells was submitted (Ex. No. 2) as follows:

| "Well | Status | Tubing | BHP @ 4600 | Remarks |
|-------|--------|--------|------------|---------|
| "No. 2 | Flowing | 185 No. | 1828 No. | Shut in 60 |
|  | Shut-in | 280 No. | 1834 No. | minutes |
| "No. 3 | Flowing | 500 No. | 1646 No. | Shut in 70 |
|  | Shut-in | 545 No. | 1675 No. | minutes |

"Irwin contends that pressures would have been identical if they were completed in the same reservoir since the wells are but 60 feet apart.

"Stanolind, offset operator, contends that the Marg-Frio Zone as has been recognized by the Commission for many years includes all the zones shown on applicant's Exhibit No. 1 and that said zone is an interconnected communicative reservoir composed of interbedded sand, shaly sand, sandy shale and shale with the various sand members in the section being placed contiguous to other sand members by faulting and that a common water table and gas cap were originally discernable.

"Production from the oil and gas areas have caused the gas cap to shrink and the water to encroach as much as 300' as shown in some of the older producing wells, i.e. Stanolind, Mathews No. 3 is watered out in the 'C' Zone. Testimony of Stanolind's engineer was to the effect that water encroachment was erratic, but was effective and in his opinion explained the water saturation in the 'E' Zone in the No. 3 Well as indicated by the log, whereas the log of the No. 2 Well indicated oil saturation in the 'E' Zone. The difference being caused by the time when the wells were drilled.

"Stanolind also cited the practice in the field to open the various members of the Marg-Frio Zone in the same well bore causing man made communication for many years in the field.

"Stanolind stated that they have no objection to Irwin using the No. 3 Well as a producer from the Marg-Frio Zone, but if that is needed to assure the greatest ultimate production from the lease, then the No. 2 well should be plugged. It was admitted that No. 3 had the better structural location of the two.

"Insofar as the pressure data was concerned the Stanolind engineer contends that the tests are of no value, because of the limited shut-in period, because both intervals were subjected to different withdrawals, and because the excessive interval perforated in the No. 2 Well as compared to the limited interval in the No. 3 well. It is his opinion that a true shut-in pressure with adequate time for stabilizing would indicate another result.

"Stanolind placed in the record that the No. 3 Well was drilled as an exception to Rule 37 Case No. 42,409 wherein the permit issued specifically stated that the well 'shall never be produced concurrently from the same zones as wells numbers 1 and 2

produce from'. The No. 3 well was projected as a deep test, but found no production below the Miocene, so it was plugged back and completed in the Marg-Frio Zone in direct violation of the permit.

"For the above reasons Stanolind is of the opinion that one of the two wells should be removed from the schedule and plugged.

"Mr. Smith for Irwin stated that he believed the applicants had discharged the burden required to show separateness of the two zones. It was his opinion that the Commission wanted a showing of separateness on the lease only and that the information submitted for the record conclusively shows this to be true.

"Respectfully submitted,
/s Fred Young
Fred Young,
Legal Examiner

"Application Approved:
Chief Engineer

Application Denied:

Chairman          s/ Olin Culberson

Commissioner      E. O. T.

Commissioner      W. J. M."

A notation is made on this report as follows:

"Applicant shows separation between Reynolds 2 & 3 Stanolind Ex 4 & Ex 5 in hearing on this field held 5/20/52 shows Reynolds No. 3 in separate fault block and in separate sand.

"s/ A. H. Barbeck."

Mr. Barbeck was Chief Engineer for the Commission, but there was no occasion for him to make the notation he did and it constitutes no part of the Commission's order.

On December 15, 1952, Mr. Barbeck wrote to Mr. Irwin as follows:

"December 15, 1952
"In re R. A. Irwin pertaining to Reynolds Wells Nos. 2 and 3, South Houston Field, Harris County, Texas

"Mr. R. A. Irwin
1106 City National Building
Houston, Texas

"Dear Sir:

"This is to advise that the Commission at a formal conference held December 8, 1952, considered your application for an opportunity to show that the Reynolds Wells No. 2 and 3 are producing from separate reservoirs in the South Houston Field.

After consideration of the data available the Commission was of the opinion that the two wells were completed in what was recognized as one reservoir and that therefore this application should be denied.

"Very truly yours,
Arthur H. Barbeck
Chief Engineer"

Subsequent to the receipt of the letter the appellee through his attorney made his Motion for Rehearing as follows:

"December 11, 1952
"To the Honorable Railroad Commission of Texas
Tribune Building
Austin, Texas

"Subject: Motion for Rehearing by R. A. Irwin on his application pertaining to his R. R. Reynolds Wells Nos. 2 and 3, South Houston Field, Harris County, Texas.

"Railroad Commission Oil & Gas Docket No. 128. No. 3–24684.

"Gentlemen:

"Comes now applicant R. A. Irwin, and requests that this Honorable Commission grant a rehearing with respect to its order of December 8, 1952, denying the applica-

tion of R. A. Irwin for an order holding that R. A. Irwin's R. R. Reynolds Wells Nos. 2 and 3 on the Mary A. Nichols Survey, A–1350, in J. D. Jones Subdivision, Block 24, South Houston Field, Harris County, Texas, are producing from separate reservoirs and that there is no intercommunication between the producing sands of these two wells, and petitioner requests that upon rehearing the application heretofore made by applicant R. A. Irwin on October 10, 1952, be in all things granted. As grounds for this motion for rehearing, petitioner shows that he desires to present additional evidence, including the following:

"1. About two weeks ago, Stanolind Oil and Gas Company completed a well in the 'D' sand in South Houston Field at a depth of about 4400 feet, located about 600 feet south of applicant's R. R. Reynolds Wells Nos. 2 and 3, after having first exhausted production in the same well at depths of 4600 to 4700, and at 4800 feet. Stanolind now has a fine flowing well from the 'D' sand in the same well, and there is no intercommunication between these sands mentioned.

"2. This is a piercement type salt dome field, and applicant desires to offer additional proof of that fact.

"3. Applicant desires to offer additional evidence that his R. R. Reynolds Wells Nos. 2 and 3, South Houston Field are producing from separate reservoirs, and that there is no intercommunication between the producing sands in those two wells, such additional evidence including:

"(a) Applicant recently pulled the screen on his No. 1 Phillips Well, South Houston Field, and ascertained additional facts which show that the two reservoirs are separate, without intercommunication between the producing sands.

"(b) Applicant recently pulled the screen on his No. 1 Vallos, South Houston Field, and ascertained additional facts which show that the two reservoirs are separate, without intercommunication between the producing sands.

"(c) After finding the facts referred to in (a) and (b) on applicant's No. 1 Phillips and No. 1 Vallos, applicant ran a gamma-ray survey on his No. 2 Lamb Well, South Houston Field, and obtained information which proves that applicant's R. R. Reynolds Well is in a separate producing reservoir.

"4. In Friendswood Field, in this vicinity, Humble Oil & Refining Co. has found the same condition existing as exists in South Houston Field and found that it did not have a continuous reservoir as originally thought. They have now recompleted practically every well in that field.

"Wherefore, applicant R. A. Irwin prays that this motion for rehearing be granted and that upon such rehearing his application for an order finding that his R. R. Reynolds Wells Nos. 2 and 3, Mary A. Nichols Survey, A–1350, in the J. D. Jones Subdivision, Block 24, South Houston Field, Harris County, Texas, are producing from separate reservoirs, and that there is no intercommunication between the producing sands of these two wells, be in all things granted.

"Respectfully submitted"

This motion was granted and a rehearing was set for January 7, 1953 and notice given appellee's attorney.

A memorandum was made by the assistant Chief Engineer to the Commission as follows:

"Austin, Texas
March 13, 1953
"Memorandum to the Commission:
"In Re: Application of R. A. Irwin pertaining to his Reynolds Wells Nos. 2 and 3, South Houston Field, Harris County, Texas.

"Date of Hearing: January 7, 1953
"Appearances: See Transcript

"This hearing is a re-hearing called as a result of a hearing held on November 6, 1952 which was the application of R. A. Irwin to produce his Wells Nos. 2 & 3, Reynolds Lease, South Houston Field in the Oligocene horizon. The hearing of

November 6, 1952, was denied by the Commission and a re-hearing was held on the application of R. A. Irwin.

"Irwin introduced a total of 19 exhibits. Exhibits 1 through 16 are all exhibits which are part of the Railroad Commission forms and files. Exhibits 16 and 17 are formerly Stanolind Oil and Gas Company's Exhibit 4 and 5 as submitted at a hearing May 21, 1952. These are both cross sections. Exhibit 18 is the identical exhibit submitted by Irwin as his Exhibit 1, November, 1951. Exhibit 19 was a 10″ section of a screen liner which was removed from R. A. Irwin's Phillips Well No. 1. This liner was originally put in the Phillips Well No. 1 in 1937 by R. Y. Smith, the operator at that time. The above information was given simply to indicate that no new exhibits were submitted by applicant R. A. Irwin, but rather a new interpretation on these previously submitted exhibits.

"Witness Simmons, representing Irwin, testified that he had calculated the gas volume underlying the *whole* South Houston Field and that his calculation was 30 billion cubic feet. At the hearing in May and November, 1952, it was testified by one of Stanolind's witnesses that approximately 2.6 billion cubic feet had been produced which was, in Stanolind's opinion at that time, approximately 25% of the gas in place. This would indicate that the gas reserve was only 10 or 11 billion cubic feet. Witness Simmons made this comparison to show the fallacy in Stanolind's contention that:

"1) Only 2.6 billion cubic feet of gas had been produced, or

"2) That it would be impossible for the oil to migrate into the gas cap such that it would be found in the Reynolds Well No. 3 at a depth of 4366 to 4386 feet. The original water-oil contact is at —4825 feet, the original gas-oil contact —4530 feet, Reynolds Well No. 3 produces from —4320 feet to —4340 feet. Based on these exhibits and the perforations in Reynolds Well No. 3, it will therefore be necessary that the gas migrate upward 210 feet. This was considered impossible by Irwin's witness since it would have been necessary for gas cap gas to have been produced. Furthermore, the

Reynolds Well No. 3 produces water. These indicate to him that the sand section from which the Reynolds Well No. 3 is producing is a separate reservoir from any other producing sand.

"Stanolind's witness testified that in the original drilling of their Wyndelts Well No. 1, that coring was commenced at 4505 feet and that from the depths from 4505 to 4522 feet, a shale was recovered, from 4522 to 4544 feet, a gas sand was encountered, from 4544 to 4546 feet, shale with sandy streaks, from 4546 to 4560 feet, a hard gas sand, shaly in streaks and from 4560 to 4576 feet, hard shaly sand and gas sand with some oil stain, 4576 to 4578 feet, lignitic shale, 4578 to 4593, hard shaly sand, oil order and stain, and from 4593 to 4599 feet, oil sand. This well was completed at the lower depth but was plugged back to test the stringer which was topped at 4515 feet for the purpose of determining whether or not oil had invaded the gas cap zone. The well was reperforated at 4523 to 4533 feet from which it produced oil at a fluctuating gas-oil ratio of 5000 to 10,000/1. The well was squeezed and reperforated from 4540 to 4550 feet and is now flowing pipe line oil at a ratio of approximately 350/1. This indicated to Stanolind's representatives that the oil column had invaded the gas cap on the Wyndelts Well No. 1, which is the offset lease to the R. A. Irwin's Reynolds Lease. Further indications were made on the Reynolds Well No. 2 drilled in 1936 in which the core well indicates that from 4550 to 4560 feet is a gas sand. This depth, corrected to a subsea, is 4510 feet, which is within the original gas cap so that oil produced in the Reynolds Well No. 2 at 4366, or —4320 feet, is now produced at approximately 200 feet above the original gas cap.

"Stanolind's witness explained the invasion of the original gas cap by the oil column as follows:

"1) That an early blowout in the field caused migration of the gas oil contact upwards.

"2) The volume displaced by a blowout was replaced by some fluid, probably oil.

"3) Wells producing in the South Houston Field have produced gas above the solution ratio since completion; therefore, the

excess must come from the gas cap. This was done since all wells were completed by setting casing at, or near, the original gas-oil contact, at –4530 feet and then open hole completion through a screen liner to a depth of 4775 feet or –4735 feet. Since these wells were *cased* at or near the gas-oil contact, it was believed by Stanolind's witnesses that the excessive gas came from gas cap migrating downward and was produced through the screen liner.

"4) There has been no appreciable loss in bottomhole pressure within the oil column. This is believed to be due to water drive; therefore, the gas produced from the gas cap either by blowout or produced as excessive gas replaced, must be by some fluids which must be oil.

"Irwin's witness stated that if his calculation of 30 billion cubic feet of gas was originally replaced in the production of 2.6 billion cubic feet of excessive gas, it would be approximately 8% of the original gas in place. In order for the oil to migrate 200 feet into the gas cap, it will be necessary that approximately 80% of the gas cap to have been produced. (Estimation of 30 billion cubic feet apparently field wide, whereas the Reynolds Lease lies in a faulted section apparently separated from the remaining portion of the field so that the 30 billion cubic feet calculated is not believed to be correct.)

"Exhibit No. 19, Irwin's, was a 10″ section of a screen liner. This liner apparently had been clogged due to the sand and mud production. This was introduced by Irwin to indicate that even though the wells were originally completed with screen liners thereby opening more than one producing section to the well bore, that the effective plugging of the screen liner isolated the individual sand members opposite the screen liner and that at the present time, it is believed by Irwin that this would effectively prevent the intercommunication between zones.

"Stanolind's witness stated that he had observed five line screeners pulled from various wells from the field and that the 10″ section presented by Irwin was in no way similar; however, the five wells from which the screen liner had been pulled had been acidized in order to stimulate the flow through the screen liner.

"In the opinion of the writer,

"1) Screen liners, either plugged or not, do not effectively prevent communication between sand zones lying opposite a screen liner, therefore, this should be given no consideration.

"2) The 30 billion cubic feet calculation of Mr. Simmons' is undoubtedly in error since he apparently calculated the gas volume over the entire field instead of the fault section in the area of the Reynolds Lease.

"3) That is evident in the Wyndelt Well No. 1 that the oil did migrate into the gas cap.

"4) That no cross sections of any kind were submitted by the applicant or the protestant which could indicate possible separation by faulting.

"In view of the above opinions and the Commission's recognition of only two producing reservoirs, that is the Miocene and the Oligocene, it is recommended that this application be denied.

"Respectfully submitted,
s/ George F. Singletary, Jr.
George F. Singletary, Jr.,
Assistant Chief Engineer

"Application Approved:     Application Denied:

_____ Chief Engineer _____

_____ Chairman     E. O. T.

_____ Commissioner     W. J. M.

_____ Commissioner     Olin Culberson"

Appellee was notified on March 23, 1953 as follows:

"Mr. R. A. Irwin
1106 City National Bank Building
Houston, Texas

"In Re: Oil and Gas Docket No. 3–25,101, Rehearing on application of R. A. Irwin pertaining to his Reynolds Wells Nos. 2 and 3, South Houston Field, Harris County.

"Dear Sir:

"At a formal conference held March 23, 1953, the Commission denied the application of R. A. Irwin to produce his Reynolds Wells Nos. 2 and 3, South Houston Field, in the Oligocene horizon.

"The Commission further ordered that effective this date, Reynolds Well No. 3 will be removed from the proration schedule.

"Yours very truly,
s/ George F. Singletary, Jr.
George F. Singletary, Jr.,
Assistant Chief Engineer"

On May 25, 1953, the Commission entered an order reciting earlier hearings and orders as have been hereinabove set out in full or referred to, and found that:

"(1) The South Houston Field contains three producing reservoirs, two of major importance: The Miocene reservoir found in the approximate interval 3871–4000 feet; and the Oligocene Frio Reservoir found in the approximate interval 4300 to 4800 feet and one of doubtful importance the Third Reservoir, Middle Frio found in one well in the interval from 5400 to 5412 feet, and recognized as separate by the Commission from evidence adduced at a hearing.

"(2) The 5-acre lease heretofore described has two wells, No. 1 Reynolds completed in a Miocene Sand and No. 2 Reynolds completed in an Oligocene Frio Sand.

"(3) No. 3 Reynolds was drilled to a total depth of 5734 feet but was completed and perforated from 4352 feet to 4386 feet.

"(4) This No. 3 Reynolds Well, as drilled and completed, is completed in the formation, sand, reservoir or zone recognized by this Commission as being the Oligocene Frio, in which the No. 2 Reynolds well had been completed theretofore.

"(5) Such completion of the No. 3 Reynolds well in the Oligocene Frio formation, sand, reservoir or zone is contrary to and in violation of the conditions incorporated in the permit heretofore set out.

"(6) Such 5-acre tract, because of its size and shape is not entitled, either under the rules of this Commission or under the law, to more than one well in the Oligocene Frio formation, sand, reservoir or zone.

"(7) The South Houston Field is not now and never has been classified as a piercement type salt dome field, and is not now and never has been developed as a piercement type salt dome field.

"Whereas, from information available in Commission files and records, and from evidence adduced from the various abovementioned hearings, the Commission is of the opinion and finds that the R. A. Irwin No. 3 Reynolds has been completed in the same zone of production as the R. A. Irwin No. 2 Reynolds, in direct violation of the condition incorporated in the permit to drill such well.

"It Is Therefore Ordered That the permit to drill R. A. Irwin No. 3 Reynolds well in the South Houston Field, Harris County, Texas, granted in Rule 37 Case No. 42,409 on November 21, 1951, be and it is hereby in all things revoked, rescinded, cancelled and vacated at its present completion depth for the breach by the permittee of the condition therein prescribed.

"It Is Further Ordered That this cause be held open on the docket for such other and further orders as may be necessary."

We believe that in view of all of the hearings in which appellee participated and offered evidence, that the Commission was justified in entering its order of March 23, 1953, and that the order of May 25, 1953

is no more than a full recitation of what was before the Commission, its own acts and orders, and is a valid and lawful order, and that the findings of fact therein contained are reasonably supported by substantial evidence and that the appellee has been afforded due process of law..

Appellee had notice under the field rules of August 22, 1935, that:

"* * * no well drilled under such special permit, which does not conform to the terms of such special permit in all respects, shall be permitted to produce either oil or gas and any such well so drilled in violation * * * of a permit granted under an exception to said rule shall be plugged."

Article 6036a, Vernon's Ann.Civ.St., provides:

"* * * The Commission may, without prior notice, revoke any rule, regulation or order promulgated by it; * * *."

█ The burden was on appellee to show that his well No. 3 was completed in a separate reservoir due to sealing faults, as he had alleged, and this fact issue was resolved by the Commission against him. Appellee introduced the instruments in the Administrative proceedings and a comment made by an employee of the Commission, such comment is not binding on the Commission. Empire Gas & Fuel Co. v. Railroad Commission of Texas, Tex.Civ.App., 94 S.W.2d 1240, error ref.

Appellee has made two cross points, complaining of the action of the trial court in excluding the stipulation and exhibits relative to the Stanolind-C. C. Matthews Well No. 3, because they were material to show prior recognition by the Commission of zones within the oligocene formation; and in sustaining the exception to Irwin's pleading that Stanolind is estopped to complain of the alleged invalidity of Well No. 3, because Stanolind has previously applied for, drilled and produced its Well No. 3.

We believe that the trial court was correct in sustaining Exception No. 1 of appellant, Stanolind Oil and Gas Company, and properly excluded the evidence offered by appellee pertaining thereto relative to the Stanolind-Matthews Well No. 3.

No similarity of completion depths, reservoir conditions or production characteristics between the Stanolind Well No. 3 and the Irwin Well No. 3 in question is present.

The Stanolind No. 3 well was completed at an interval of 5400–12 feet, which is more than 1,000 feet deeper than appellee's well, and, after application, notice and hearing, the Commission found and entered an order that Stanolind's Well No. 3 was completed in a separate and distinct reservoir, and the Commission granted Stanolind a discovery allowable for that well. The situation in regard to Stanolind's Well No. 3, and that of appellee's Well No. 3 are not analogous because the Commission had previously concluded that Stanolind's Well No. 3 was legal in that it was completed in a separate and distinct reservoir, whereas, the exact opposite was concluded with respect to appellee's Well No. 3 and Stanolind had the right to align itself with the Commission and question the legality of appellee's well.

As a fact, the Stanolind Well No. 3 was abandoned and was removed from the proration schedule on January 1, 1953, prior to the date of the Commission's action in removing the appellee's Well No. 3 from the proration schedule on March 23, 1953. Therefore, as a matter of law, the circumstances surrounding the drilling and completion of the Stanolind Well No. 3 could not have affected the right of the Commission to take the appellee's well off the schedule on March 23, 1953.

█ Estoppel does not lie against the Commission in a conservation matter where an issue of waste is involved.

█ The appellants are not guilty of laches or of waiver in this case, and the rights of appellee were not violated under the equal protection of law clauses of the Constitution of the United States and of Texas.

The acts of Stanolind cannot create any estoppel against the Commission.

The judgment of the trial court is reversed, and injunction dissolved, and judgment here rendered for appellants.

Reversed and rendered; injunction dissolved.